ORDER
GRITT, JUDGE:
An application of the claimant, Michael Filie, for an award under the West Virginia Crime Victims Compensation Act, was filed March 15, 2002. The report of the Claim Investigator, filed September 5, 2002, recommended that an award of $25,000.00 be granted, to which the claimant filed a response indicating his agreement. An Order was issued on September 25, 2002, reversing the Investigator's recommendation and denying the claim, in response to which the claimant's request for hearing was filed October 9, 2002. This matter came on for hearing March 27, 2003, claimant appearing in person and by counsel, Michael E. Froble, and the State of West Virginia by counsel, Jennifer L. Stollings, Assistant Attorney General.
On April 1, 2000, at approximately 12:30 a.m., the 32-year-old claimant was assaulted and severely beaten twice while a patron of the Midnight Rodeo Bar in Huntington, Cabell County. The claimant testified that on that evening, his brother-in-law, John Keaton, came to the claimant's place of employment at approximately 9:00 p.m. and drove the two of them to the Midnight Rodeo Bar (Transcript, page 23). The claimant and Mr. Keaton were meeting Filomena Keaton, who is claimant's sister and John Keaton's wife, along with a few friends with whom she worked (Transcript, page 24). The claimant stated that he had been to the Midnight Rodeo Bar only once before and that he did not frequent bars often.
According to the claimant, they arrived at the Midnight Rodeo Bar- at approximately 9: 15 p.m. (Transcript, page 25). They were seated at the bar on the first floor most of the night and had a few drinks with a friend named Randy who happened to show up (Transcript, page 25). The claimant stated that he had three Jim Beam's with Coke to drink the entire evening and that he did not believe himself to be intoxicated or unable to control himself (Transcript, page 26). He also stated that he ate dinner earlier that evening between 8:15 p.m. and 8:30 p.m. before going to the bar (Transcript, page 23).
*436 Upstairs at the bar were the claimant’s sister and her coworkers, watching a male strip show. The claimant and Mr. Keaton remained downstairs (Transcript, page 24). The claimant recalled sitting at the bar with Mr. Keaton and Randy, but the next thing he remembered about that evening was sitting in Mrs. Keaton' s vehicle seriously injured. He believes that someone may have struck him in the back of the head with a "slap jack" because the cuts on the back of his head were consistent with such a weapon (Transcript, page 27). The claimant testified that he must have lost consciousness at some point either inside the bar or outside, but he thought it was inside the bar because that was the last place he remembered being until briefly regaining consciousness in his sister's car (Transcript, page 28). He did not recall having an argument or disagreement with anyone inside the bar and that to do so is not consistent with his temperament (Transcript, page 26).
Filomena Keaton testified that she was on the second floor of the bar most of the night with her friends from work. She stated that she saw the claimant and Mr. Keaton sitting at the bar downstairs together most of the night, and that she saw absolutely no conflicts of any type until she was getting ready to leave (Transcript, page 5). Mrs. Keaton testified that she walked downstairs and briefly spoke to the claimant prior to the altercations. According to Mrs. Keaton, the claimant was coherent, able to talk, and did not appear to be intoxicated (Transcript, page 7). Mrs. Keaton testified that she had consumed approximately "three shots" of tequila the entire evening. She was getting ready to leave the bar and walked downstairs to the lower level to talk to the claimant when she saw that he was no longer on the bar stool (Transcript, page 7). She testified that the claimant and her husband were getting ready to leave and both had walked out to the car. Mrs. Keaton remained inside talking to a friend but was preparing to leave (Transcript, page 8). At this time, the claimant came back inside and asked who a person named Daniel was. She pointed him out to the claimant (Transcript, page 8), who then walked over to Daniel to speak to him. Mrs. Keaton turned around to tell her friend she was leaving when suddenly some type of commotion caught her attention (Transcript, page 8). She testified that there was a large circle of people standing around a number of people in the floor. She stated that "everybody was pushing, shoving, hitting, screaming" (Transcript, page 8). However, Mrs. Keaton did not see the actual fight inside, nor did she know who attacked her brother. She stated that by the time she turned around and saw her brother, the fight was over (Transcript, *437 page 15). The next thing she recalls doing was wiping the blood off her brother's face and trying to stop the bleeding (Transcript, page 10). She stated that the claimant's entire face was covered in blood and that she was unable to get it to stop. Shortly after the altercation, Mrs. Keaton helped the claimant out the door and to the car (Transcript, page 10). Once they reached the car, Mr. Keaton was shocked to see the claimant's injuries and got out of the car to see what had occurred (Transcript, page 10). According to Mrs. Keaton, Mr. Keaton walked over to talk to Frank White, whom Mrs. Keaton described as an old friend of Mr. Keaton's, to ask him if he knew what happened (Transcript, page 11). She testified that Mr. Keaton was persistent in asking Frank White what happened and who attacked the claimant (Transcript, page 11). At this point, she stated that another fight broke out outside the Midnight Rodeo Bar and that people were "everywhere" (Transcript, page 11). She also stated that the claimant ended up getting involved in this fight. She observed someone named Marcus hitting the claimant (Transcript, page 11). She did not know Marcus' last name. The next thing she noticed was the large crowd slowly clearing away and the claimant lying on the ground unconscious and making "snoring respirations" (Transcript, page 12). She knew at that time that he had a head injury (Transcript, page 12). Mrs. Keaton went to the hospital with the claimant but she stated that no one from the Huntington Police Department took a statement from her (Transcript, page 13). Mrs. Keaton testified that she is aware that Frank White is the only person to be prosecuted for the attack upon the claimant, but she has no information regarding the person she identified as Marcus (Transcript, page 13). Finally, Mrs. Keaton testified that she did not see nor hear the claimant hit or physically attack anyone the entire night (Transcript, page 15). It was her contention that the claimant did not do anything to instigate the attacks upon himself (Transcript, page 16).
Christopher Allen Hysell, a friend of the claimant's, testified that on the night at issue he and a few friends happened to be driving by the Midnight Rodeo Bar at approximately 2:00 a.m. (Transcript, page 17). He and his friends had been somewhere else that night and were not going to stop at the Midnight Rodeo Bar, until Mr. Hysell looked at the parking lot and saw Michael Filie lying on the ground surrounded by approximately twenty guys (Transcript, page 18). He *438 testified that he saw a person he knows only as "Marcus" hitting claimant, who was unconscious on the ground.
The claimant testified that he does not recall why he wanted to speak to Daniel or what they spoke about (Transcript, page 32). He stated that all he knows is that he had met Daniel earlier in the evening and talked to him (Transcript, page 32). He does not know Daniel's last name. All he knew about Daniel was that he worked with his sister at the hospital, and to the best of his knowledge they were probably talking about their job (Transcript, page 39). The claimant also believes that it was during this conversation inside the bar that he was first attacked (Transcript, page 39). He does not recall anything bad happening between himself and Daniel, and recalls getting along well with him. Neither does he believe that his conversation with Daniel was the cause of the attack or precipitated it in anyway (Transcript, page 39). At the time the claimant completed his "Crime Victims Compensation Fund" application, he stated that the suspect offenders who attacked him were bouncers employed by the Midnight Rodeo Bar. At that time, he believed that the two attackers' names were Frank White and Marcus (Transcript, page 39). However, the claimant testified that he later discovered at the deposition of Johnny Ray Rice, owner of the Midnight Rodeo Bar, that there were no bouncers on duty that night and that neither Frank White nor a person named Marcus was present at the bar that night (Transcript, pages 35-36). Thus, the claimant does not know who attacked him or why. The claimant regained his memory four days after the incident while in Cabell Huntington Hospital. As a result of the two attacks, Mr. Filie suffered broken facial bones, a broken jaw, and serious and frequent headaches. He also sustained inner ear damage (Transcript, page 29).
By Order entered September 25, 2003, the Court did not accept the original findings of the Claim Investigator and denied the claim due to the vague nature of the facts giving rise to the incident. The Court stated in that Order that the claimant's actions prior to the altercation are unknown and that the Court cannot engage in speculation as to what in fact did occur.
Nicole Reed, Assistant Claim Investigator for the West Virginia Crime Victims Compensation Fund, testified that she assisted in writing the original recommendation (Transcript, page 42). She testified that she was asked by the Court to contact the Huntington Police Department and attempt to find out more *439 information and gain additional insight into how this incident occurred (Transcript, page 47). The police report gave only vague and generalized information. However, upon calling the Huntington Police Department, Ms. Reed was informed that the investigating officer had since left the Department and could not be reached. Stephanie Knight, Claim Investigator for the West Virginia Crime Victims Compensation Fund, testified that her initial Finding of Fact and Recommendation granting claimant an award was denied by the Court due to the vagueness of the facts. She testified that her responsibilities in determining the merits of a claim include reviewing the claimant’s application form, the police report, the medical records, medical bills, and court records (Transcript, page 62).
In a claim for compensation under the Crime Victims Compensation Act, a claimant has the burden of proof in establishing that he or she is an “innocent victim of crime.” Once a claimant has established that he or she is an innocent victim of crime under the statute, then the burden of proof shifts back to the respondent to prove by a preponderance of the evidence that the claimant was not an innocent victim of crime.
In the present claim, the claimant established at the hearing that he was brutally attacked and beaten twice by at least one assailant. Further, the testimony adduced at the hearing established that the claimant did not provoke nor cause the two altercations. Thus, the Court is of the opinion that the claimant is an innocent victim of crime. Respondent failed to adequately rebut the claimant's evidence and did not establish that he caused or contributed to the altercations at issue.
In view of the foregoing, the Court is of the opinion to and does hereby make an award in this claim in the amount of $25,000.00 as set forth in the original Finding of Fact and Recommendation.